**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KATHERINE MILLER<br>130 Serpentine Drive<br>Bayville, NJ 08721<br><br>　　　　Plaintiff,<br><br>　v.<br><br>PREFERRED BEHAVIORAL HEALTH<br>OF NJ, INC. *d/b/a* PREFERRED<br>BEHAVIORAL HEALTH GROUP<br>1500 NJ-88<br>Brick Township, NJ 08724<br><br>　　　　Defendant. | **CIVIL ACTION**<br><br>No. 3:21-16573 (MAS) (TJB)<br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Plaintiff, Katherine Miller (*hereinafter* referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1.　Plaintiff has initiated this action to redress violations by Preferred Behavioral Health of NJ, Inc. *d/b/a* Preferred Behavioral Health Group of the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §2601 *et seq.*), the New Jersey Law Against Discrimination ("NJ LAD"), the Fair Labor Standards Act ("FLSA" - 29 U.S.C. § 201 *et. seq.*), and New Jersey Wage and Hour Law(s) ("NJ WHL" – N.J.S.A. §§ 34:11-56a, *et seq.*).  As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

**JURISDICTION AND VENUE**

2. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law. This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny. Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant resides in and/or conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

4. Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing and dual-filing her Charges with the EEOC, and by filing the instant lawsuit within 90 days of receiving her right-to-sue letters from the EEOC.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. Preferred Behavioral Health of NJ, Inc. *d/b/a* Preferred Behavioral Health Group is a healthcare organization that provides behavioral health care services, with a location as set forth at the above-captioned address.

8. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

9. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10. Plaintiff was employed by Defendant for approximately 13½ years, working out of Defendant's 591 Lakehurst Road, Toms River, New Jersey location.

11. Plaintiff, a Licensed Clinical Social Worker ("LCSW"), was initially hired by Defendant as a Crisis Intervention Specialist but was eventually promoted to Program Coordinator in or about the summer of 2017.

12. At all times relevant herein, Plaintiff was supervised by the now Director of Children Services, Sandra Grebel (*hereinafter* "Grebel") and Director of Intensive Community Services for Youth and Family, David Bolignesi (*hereinafter* "Bolignesi").

13. Throughout her tenure with Defendant, Plaintiff was a hard-working employee who performed her job well.

### -Disability Discrimination-

14. At all relevant times during Plaintiff's employment with Defendant, Plaintiff suffered from and continues to suffer from serious health conditions, including but not limited to, an anxiety disorder (and resulting complications).

15. As a result of her aforesaid health conditions, Plaintiff experiences fear, panic attacks, and sleeplessness, which (at times) limits her ability to perform some daily life activities, including but not limited to sleeping, focusing, and working (among other daily life activities).

16. Despite her aforesaid health conditions and limitations, Plaintiff was able to perform the duties of her job well with Defendant; however, Plaintiff did require some reasonable accommodations while employed with Defendant (as discussed *infra*).

17. Plaintiff apprised Defendant's management of her aforesaid disabilities and need for medical accommodations on several occasions throughout and leading up to the end of her employment with Defendant.

18. For example, beginning in or about 2013 and leading up to her constructive discharge from Defendant on or about August 16, 2021 (discussed further *infra*), Plaintiff utilized intermittent and/or block FMLA on multiple occasions for her aforesaid serious health conditions.

19. Throughout her tenure with Defendant, Defendant's management exhibited clear frustration with Plaintiff's disabilities and requests for accommodations, often subjecting Plaintiff to multiple forms of hostility and animosity. By way of example, but not intended to be an exhaustive list:

   a. Defendant's management overly scrutinized and criticized Plaintiff's work;

   b. Plaintiff was given an unfair distribution of work – almost double the amount of case managers to coordinate as her coordinator co-workers;

   c. Plaintiff requested additional assistance as she was struggling to manage double the workload of her co-workers; however, her concerns were ignored, which exacerbated her aforesaid serious health conditions; and

4

    d. Plaintiff was pressured to return from medical and/or FMLA leave on more than one occasion before her doctor cleared her, which she did for fear of losing her job.

20. Following her concerns of disparate treatment, including but not limited to unfair work distribution, to Defendant's management, Plaintiff was subjected to increased animosity and hostility. Including, but not limited to:

    a. In or about 2019, while Defendant eventually equally divvied up case managers between Plaintiff and her co-workers, Grebel berated Plaintiff for purportedly "not coming to [her] first," despite the fact that Plaintiff had complained of the unequal workload on several occasions to Grebel, which she ignored;

    b. Plaintiff's coordinator co-workers stopped talking to her, refused to cover her on days that she called out sick, and began to exclude her from important team emails; and

    c. On at least one occasion, one of Plaintiff's coordinator co-workers filed a baseless complaint against Plaintiff for alleged "hostility," alleging Plaintiff did not say "hello" to her one day.

21. When Plaintiff complained of the aforesaid instances of unfair treatment to Grebel, she hostility advised Plaintiff that if she could not "make this right" with her co-workers, Grebel would have to increase her monitoring of Plaintiff's work.

22. Plaintiff performed her job duties well for the next several months, despite that Defendant's management and her co-workers continued to subject her to hostility and animosity.

23. Thereafter, in or about the end of 2020, Grebel informed Plaintiff of a job opening – Assistant Director of Intensive Community Services for Youth and Family – for which Plaintiff and another co-worker, Jade Simons (*hereinafter* "Simons"), were the only eligible candidates.

5

24. When Plaintiff showed interest in the aforesaid Assistant Director position, Grebel advised Plaintiff to "think about it" because she did not want the new position to "affect [Plaintiff's] health and well-being" – upon Plaintiff's information and belief, a direct reference to her disabilities and/or requests for accommodations (*i.e.,* medical leave).

25. When Plaintiff questioned Grebel as to why she thought it may be too stressful for her health for Plaintiff to apply for the aforesaid Assistant Director position, Grebel quickly backpedaled and replied that she was referencing Plaintiff's ability to spend time with her newborn child. Plaintiff responded to Grebel that she was surprised she was attempting to dissuade ***just Plaintiff*** from applying for the position because Simons also had a newborn child at home, but Grebel quickly changed the subject.

26. Thereafter, both Plaintiff and Simons applied for the Assistant Director position. However, the position was ultimately awarded to Simons in or about December of 2020, despite the fact that Plaintiff had twice as many years tenure with Defendant and more experience in the field than Simons (who was fresh out of graduate school upon her hire with Defendant).[1]

27. For the next several months, Plaintiff continued to be subjected to animosity, hostility, and disparate treatment, including but not limited to being the only Project Coordinator who did not receive a raise, in or about January/February of 2021.

28. The aforesaid disparate treatment that Plaintiff was subjected to, including but not limited to the failure to promote/hire and lack of raise, led to an exacerbation of her aforesaid mental health conditions. As a result, in or about April of 2021, Plaintiff requested block FMLA leave to care for and treat for her aforesaid serious health conditions.

---

[1] Insultingly, Plaintiff was offered the ability to handle a less favorable clinical duty of Simons' new Assistant Director position by Bolignesi; however, it involved more taxing work, including having to be immediately available when Case Managers were ready to go, while being compensated at approximately $15,000 to $20,000 less than Simon's Assistant Director role. Plaintiff declined the role, which would have exacerbated her aforesaid health conditions.

29. Defendant's Human Resources ("HR") Director, Dottie Kocak (*hereinafter* "Kocak"), however, exhibited clear frustration with Plaintiff's need for FMLA leave, initially refusing to answer Plaintiff's questions about how much FMLA time she had available. Kocak also harshly advised Plaintiff multiple times that her job was only "protected" until her FMLA leave expired.

30. Thereafter, Plaintiff commenced her FMLA leave, during which she kept Defendant's management and HR apprised of the status of her aforesaid health conditions.

31. On or about May 21, 2021, Plaintiff received an email from Kocak stating that her "job protection through FMLA" would come to an end on May 27, 2021. The email further requested the status of Plaintiff's return to work and that Defendant is "willing to extend your leave one more week [until June 3, 2021], if you will be returning at that time."

32. In response to Kocak's May 21, 2021 email stating that Plaintiff's FMLA leave would be exhausted on or about May 27, 2021, Plaintiff asked what her options were as her doctor had completed disability paperwork with a return to work date of July 8, 2021.

33. On or about May 25, 2021, in response to Plaintiff's aforesaid email request for her options regarding extending her medical leave, Kocak advised Plaintiff that if she could not return to work on or about June 3, 2021, Defendant would "administratively terminate [her] employment."

34. Defendant's HR department rejected Plaintiff's aforesaid inquiry regarding extending her medical leave for just an additional month (a reasonable accommodation under the ADA and the NJ LAD) without providing any specific reasons as to why and without first engaging in the interactive process, as required by the ADA and the NJ LAD.

35. Because she was fearful of losing her job, Plaintiff reached out to her doctor and obtained a note to return to work on or about June 3, 2021.

36. Over the next two months, Plaintiff performed her job duties well. However, she continued to be subjected to discriminatory and retaliatory treatment by Defendant's management and her co-workers because of her aforesaid disabilities and/or request for accommodations, including being consistently ignored, left out of conversations and emails, and not provided with information needed for weekly team meetings.

37. Unfortunately, on or about August 16, 2021, due to the negative effect the aforesaid hostile work environment had on Plaintiff's health conditions, Plaintiff felt that she had no other choice than to resign her employment with Defendant.

38. Thus, after continuously being subjected to a hostile work environment, denied a promotion/hire opportunity within Defendant, and refused her requested accommodations (additional medical leave), Plaintiff was constructively discharged from her employment with Defendant on or about August 16, 2021.

## -Overtime and Wage Violations-

39. In addition to the foregoing claims, Plaintiff was also not paid in accordance with state and federal overtime/wage laws.

40. At all times relevant during Plaintiff's employment with Defendant, Plaintiff was a non-exempt employee who was paid initially at the hourly rate of $26.00, which was then increased to approximately $29.60, for her role as Program Coordinator.

41. Beginning shortly after her hire and throughout her tenure with Defendant, Plaintiff often worked approximately 5 to 15 hours of overtime per week, which was regularly observed by Defendant.

42. For the majority of Plaintiff's tenure, however, she was not paid *any wage* for any hours she worked over 40 per week.

43. Defendant knew that Plaintiff was unequivocally a non-exempt employee who should have been paid overtime for all hours worked over 40 hours per week at a rate of time and one half.

44. Defendant's management unlawfully and willfully instructed Plaintiff that she and other employees were prohibited from entering over 40 hours per week in Defendant's payroll system, despite observing and/or knowing that Plaintiff and other similarly-situated employees consistently worked several hours of overtime each week.

45. When Plaintiff and other similar-situated employees regularly came into work 2-3 hours early and/or worked several hours into the night in order to complete all of the work that Defendant required, they were advised that it was their "personal choice" to do so and would not be paid overtime – despite that Defendant's management was aware that they were working several hours of overtime each week.

46. Plaintiff objected to/questioned Defendant's aforesaid illegal pay practices on several occasions to Defendant's management leading up to her constructive discharge.

47. In or about January of 2021, Plaintiff was frustrated with not being compensated any wages for all of the hours she worked over 40 each week, and she began to enter all hours she worked over 40 each week into Defendant's payroll system – despite Defendant's unlawful directive to the contrary.

48. In or about March of 2021, Bolignesi questioned the overtime hours that Plaintiff was logging in to Defendant's payroll system for hours she had worked over the weekend, and informed Plaintiff that any weekend work was "rolled into [her] salary." This was categorically

untrue, as at all times relevant herein, Plaintiff was a "non-exempt" employee paid on an hourly basis.

49. When Plaintiff objected to Bolignesi's misclassification of her as an exempt salaried employee, he failed to respond. However, a few months later, in or about June of 2021, Bolignesi sent an email to all members of the team, advising employees to report all hours worked on time sheets so that they could be compensated for same.

50. While Defendant began to pay Plaintiff for all hours she worked over 40 beginning in or about January of 2021, in accordance with federal and state wage laws, Plaintiff was never compensated for all wages she worked over 40 leading up to January of 2021. Defendant's belated effort to honor its state and federal wage and hour obligations does not obviate the need for liquidated damages, as these damages are still owed for each and every penny of overtime she was not properly paid as mandated by applicable law.[2]

51. All of Defendant's actions as aforesaid are without question willful, intentional and in blatant disregard for state and federal laws, as evidenced by:

---

[2] *See, e.g.*, *Solis v. Min Fang Yang*, 345 Fed. Appx. 35, 38 (6th Cir. 2009)(affirming award of liquidated damages explaining "under the Act, liquidated damages are compensation, not a penalty or punishment, and no special showing is necessary for the awarding of such damages. Rather, they are considered the norm and have even been referred to by this court as mandatory"); *Gayle v. Harry's Nurses Registry, Inc*., 594 Fed. Appx. 714, 718 (2d Cir. 2014)(affirming award of liquidated damages explaining there is an automatic "presumption" of liquidated damages and "[d]ouble damages are the **norm,** single damages the exception," as the burden to avoid liquidated damages is a "difficult burden"); *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014)(affirming award of liquidated damages explaining they are the "norm" and "mandatory" unless the employer can establish the very "difficult burden" of subjective and objective attempts at FLSA compliance); *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008)(affirming award of liquidated damages explaining that the employer mistakenly argues its non-compliance was not willful, misunderstanding the high burden to show affirmative steps of attempted compliance and research of the FLSA and separately that its diligence and belief in non-payment of overtime was also objectively reasonable.); *Chao v. Hotel Oasis, Inc.,* 493 F.3d 26, 35 (1st Cir. 2007)(affirming award of liquidated damages explaining that they will always be considered the "norm" in FLSA cases); *Lockwood v. Prince George's County,* 2000 WL 864220, at *6(4th Cir. 2000)(affirming award of liquidated damages explaining they are the "norm" and that an employer may not take an ostrich-like approach and refuse to research its obligations under the FLSA and to objectively explain why it failed to comply with the FLSA); *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 405 (7th Cir. 1999)(reversing the district court for not awarding liquidated damages, as doubling unpaid overtime is the rule, not an exception); *Nero v. Indus. Molding Corp*., 167 F.3d 921, 929 (5th Cir. 1999)(affirming award of liquidated damages, as there is a presumption of entitlement to liquidated damages which are the norm).

    a. Defendant's failure to pay Plaintiff any wages for all hours that she worked over 40 in a single work week beginning shortly after her hire up until in or about January of 2021;

    b. Defendant's failure to pay Plaintiff overtime compensation (at a rate of time and one half) for all hours worked in excess of 40 hours a week beginning shortly after her hire up until in or about January of 2021;

    c. Defendant intentionally instructing Plaintiff NOT to report to payroll any hours that she worked over 40 in one week leading up to January of 2021, to avoid state and/or federal wage obligations; and

    d. Defendant's intentional misclassification of Plaintiff for several years as "exempt" to avoid state and/or federal wage obligations and cheat Plaintiff out of legally entitled earnings (*see* Paragraph 48, *supra*).

52. As a direct and proximate result of Defendant's aforesaid business practices, Plaintiff has suffered damages in the form of several years of unpaid minimum wage/overtime compensation, in violation of federal and state wage laws.

### COUNT I
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
([1] Disability Discrimination; [2] Hostile Work Environment; [3] Retaliation; and [4] Failure to Accommodate)

53. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

54. Plaintiff suffered from qualifying health conditions under the NJ LAD which affected her ability (at times) to perform some daily life activities including but not limited to sleeping, focusing, and working (among other daily life activities).

55. Plaintiff kept Defendant's management informed of her serious medical conditions and need for medical treatment and other accommodations.

56. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, Plaintiff did require reasonable accommodations at times.

57. Plaintiff requested reasonable medical accommodations from Defendant, including but not limited to intermittent and/or block medical leave to care for and treat for her health conditions.

58. Plaintiff was subjected to hostility and animosity due to her health and/or requests for accommodations through demeaning and/or discriminatory treatment towards her (set forth *supra*).

59. Plaintiff objected to the aforementioned instances of disparate treatment and disability discrimination to Defendant's management.

60. In response to Plaintiff's objections, Defendant's management bombarded Plaintiff with increased hostility, animosity, and disparate treatment.

61. Plaintiff was denied a promotion/hire opportunity within Defendant because of her health conditions.

62. Defendant refused to accommodate Plaintiff's request for a brief one-month extension of her medical leave without first engaging in the interactive process as required under the NJ LAD.

63. After continuously being subjected to a hostile work environment, denied a promotion/hire opportunity within Defendant, and refused her requested accommodation, Plaintiff had no choice but to resign from her employment with Defendant effective August 16, 2021.

64. Plaintiff believes and therefore avers that she was subjected to a hostile work environment and/or denied a promotion/hire opportunity within Defendant because of: (1) her known and/or perceived health problems; (2) her record of impairment; (3) her requested accommodations; and/or (4) her expressed concerns of unfair treatment because of her health conditions.

65. Lastly, Plaintiff believes and therefore avers that she was constructively discharged from her employment with Defendant because of (1) her known and/or perceived disabilities; (2) her record of impairment; (3) her requested accommodations; (4) Defendant's failure to accommodate her disabilities; and/or (5) her expressed concerns regarding Defendant's aforesaid NJ LAD violations.

66. These actions aforesaid constitute violations of the NJ LAD.

## COUNT II
## Violations of the Family and Medical Leave Act ("FMLA")
**(Retaliation & Interference)**

67. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68. Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

69. Plaintiff requested leave for medical reasons from Defendant, her employer, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

70. Plaintiff had at least 1,250 hours of service with Defendant during her last full year of employment.

71. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

72. Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

73. Plaintiff requested/utilized FMLA in close proximity to her constructive discharge.

74. Plaintiff seeks relief herein for: (1) Defendant's attempts and actions towards her that would dissuade a reasonable person from exercising her rights under the FMLA; (2) Defendant's admonishment of Plaintiff for her exercise and/or attempted exercise of her FMLA rights; and (3) for constructively discharging Plaintiff because she exercised her FMLA rights.

75. The harm, prejudice, and constructive discharge of Plaintiff are directly a result of Defendant's interference and retaliatory violations of the FMLA.

## COUNT III
**Violations of the Fair Labor Standards Act ("FLSA")**
**(Failure to Pay Minimum/Overtime Wages)**

76. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

77. At all times relevant herein, Defendant, has and continues to be, an "employer(s)" within the meaning of the FLSA.

78. The FLSA requires covered employers, such as Defendant, to minimally compensate their "non-exempt" employees, such as Plaintiff, at a rate of 1.5 times the employee's regular rate of pay for each overtime hour that the employee works in excess of 40 hours in a workweek.

79. At all times relevant herein, Plaintiff was a non-exempt "employee" within the meaning of the FLSA.

80. Defendant knew that Plaintiff was a "non-exempt" employee within the meaning of the FLSA.

81. Defendant failed to pay Plaintiff proper overtime compensation for all hours that she worked over 40 hours in one week leading up to and until January of 2021.

82. Defendant also failed to pay Plaintiff her regular hourly rate for all of the hours she worked during her employment leading up to and until January of 2021.

83. Plaintiff expressly complained to Defendant about non-payment of overtime compensation.

84. As a result of Defendant's failure to pay Plaintiff the aforesaid minimum wage/overtime compensation due her up to and until January of 2021, Defendant violated the FLSA and caused Plaintiff to suffer damages in the form of unpaid overtime compensation.

**COUNT IV**
**New Jersey Wage and Hour Law (NJ "WHL") & New Jersey Wage Payment Law (NJ "WPL")**
**(Unpaid Overtime Wages & All Wages)**

85. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

86. At all times relevant herein, Defendant, has and continues to be, an "employer(s)" within the meaning of the NJ WHL.

87. At all times relevant herein, Plaintiff was a non-exempt "employee" within the meaning of the NJ WHL.

88. The NJ WHL requires covered employers, such as Defendant, to minimally compensate their "non-exempt" employees, such as Plaintiff, at a rate of 1.5 times the employee's

regular rate of pay for each overtime hour that the employee works (*i.e.*, hours in excess of 40 hours in a workweek).

89. Defendant knew that Plaintiff was a "non-exempt" employee within the meaning of the NJ WHL.

90. Defendant failed to pay Plaintiff proper overtime compensation for all hours that she worked over 40 hours in one week leading up to and until January of 2021.

91. Defendant also failed to pay Plaintiff her regular hourly rate for all of the hours she worked during her employment leading up to and until January of 2021.

92. Plaintiff expressly complained to Defendant about non-payment of overtime compensation.

93. Plaintiff is entitled to all statutory damages and enhancements consistent with the New Jersey Wage Payment Law(s) including, but not limited to, the statutory penalties defined in N.J.S.A. § 34:11-4.10.[3]

94. As a result of Defendant's failure to pay Plaintiff the overtime compensation and all wages due her, Defendant violated the NJ WHL and NJ WPL and caused Plaintiff to suffer damages in the form of unpaid wages and overtime compensation.

## COUNT V
## Violations of the Americans with Disabilities Act ("ADA")
([1] Disability Discrimination; [2] Hostile Work Environment; [3] Retaliation; and [4] Failure to Accommodate)

95. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

---

[3] Plaintiff is also entitled to a six-year "lookback" period for the recovery of unpaid minimum wage and unpaid overtime compensation under N.J.S.A. § 34:11-56a25.1.

96. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities including but not limited to sleeping, focusing, and working (among other daily life activities).

97. Plaintiff kept Defendant's management informed of her serious medical conditions and need for medical treatment and other accommodations.

98. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, Plaintiff did require reasonable accommodations at times.

99. Plaintiff requested reasonable medical accommodations from Defendant, including but not limited to intermittent and/or block medical leave to care for and treat for her health conditions.

100. Plaintiff was subjected to hostility and animosity due to her health and/or requests for accommodations through demeaning and/or discriminatory treatment towards her (set forth *supra*).

101. Plaintiff objected to the aforementioned instances of disparate treatment and disability discrimination to Defendant's management.

102. In response to Plaintiff's objections, Defendant's management bombarded Plaintiff with increased hostility, animosity, and disparate treatment.

103. Plaintiff was denied a promotion/hire opportunity within Defendant because of her health conditions.

104. Defendant refused to accommodate Plaintiff's request for a brief one-month extension of her medical leave without first engaging in the interactive process as required under the ADA.

105. After continuously being subjected to a hostile work environment, denied a promotion/hire opportunity within Defendant, and refused her requested accommodation, Plaintiff had no choice but to resign from her employment with Defendant effective August 16, 2021.

106. Plaintiff believes and therefore avers that she was subjected to a hostile work environment and/or denied a promotion/hire opportunity within Defendant because of: (1) her known and/or perceived health problems; (2) her record of impairment; (3) her requested accommodations; and/or (4) her expressed concerns of unfair treatment because of her health conditions.

107. Lastly, Plaintiff believes and therefore avers that she was constructively discharged from her employment with Defendant because of (1) her known and/or perceived disabilities; (2) her record of impairment; (3) her requested accommodations; (4) Defendant's failure to accommodate her disabilities; and/or (5) her expressed concerns regarding Defendant's aforesaid ADA violations.

108. These actions aforesaid constitute violations of the ADA

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to be prohibited from continuing to maintain their illegal policies, practices or customs of discriminating/retaliating against employees and are to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B. Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority.

Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation/interference at the hands of Defendant until the date of verdict;

C. Plaintiff is to be awarded liquidated and punitive damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate;

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

G. Plaintiff's claims are to receive trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

        Respectfully submitted,

        **KARPF, KARPF & CERUTTI, P.C.**

By:    */s/ Julia W. Clark*
        Julia W. Clark, Esq.
        3331 Street Road
        Two Greenwood Square, Suite 128
        Bensalem, PA 19020
        (215) 639-0801

Dated: January 24, 2022